In re PEARSON INDUSTRIES, INC., Debtor.

In re INDUSTRIAL & MUNICIPAL ENGINEERING, INC., Debtor.

Richard E. BARBER, Chapter 7 Trustee for Pearson Industries, Inc., and Industrial and Municipal Engineering, Inc., Plaintiff,

v.

McCORD AUTO SUPPLY, INC., Defendant.

Bankruptcy Nos. 89–81684, 89–81834. Adv. Nos. 90–8116, 90–8109.

United States Bankruptcy Court, C.D. Illinois.

March 9, 1995.

Thomas L. Perkins, Quinn, Johnston, Henderson & Pretorious, Peoria, IL, for defendant.

Barry M. Barash, Barash & Stoerzbach, Galesburg, IL, for plaintiff.

U.S. Trustee, Peoria, IL.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

In stage one of this litigation between the Plaintiff, the Trustee in Bankruptcy (TRUSTEE) for both PEARSON INDUSTRIES, INC. (PEARSON) and INDUSTRI-AL AND MUNICIPAL ENGINEERING, INC. (IME),[1] and the Defendant, McCORD AUTO SUPPLY, INC. (McCORD), the parties filed cross motions for summary judgment on the issues of liability, reserving any issues of damages. This Court found for the TRUSTEE on the issue of liability on Count II of the complaint alleging that the Debtor's return of certain inventory to McCORD was a preference as to IME under § 547 of the Bankruptcy Code, 11 U.S.C. § 547, and an avoidable post-petition transfer as to PEAR-SON under § 549 of the Bankruptcy Code, 11 U.S.C. § 549.[2]

In the second stage of this litigation, the parties have submitted the issue of damages. They have done so based upon a stipulation of facts.[3] For the purposes of this Opinion, the pertinent stipulated facts are as follows:

2. PEARSON INDUSTRIES, INC. ("PEARSON") manufactured fertilizer spreaders. INDUSTRIAL & MUNICI-PAL ENGINEERING, INC. ("IME") manufactured municipal waste handling vehicles. (PEARSON and IME are hereafter jointly referred to as the "Debtors".) McCORD supplied the tires and wheels that were used by the Debtors in manufacturing these vehicles.

6. On October 16, 1989 an involuntary bankruptcy petition under Chapter 11 of the bankruptcy code was filed against PEARSON. On October 31, 1989, IME filed a voluntary petition under Chapter 11. On October 27 and 28, 1989, with the Debtors' consent, McCORD shipped all of the tires and wheels located in the Galva warehouse back to its main warehouse in Indiana. Attached hereto as Exhibit A is a list of the returned inventory (the "Galva

1. Jointly PEARSON and IME will be referred to as "Debtors".

2. The facts giving rise to this litigation can be found in this Court's previous opinion, *In re Pearson Industries, Inc.*, 147 B.R. 914 (Bkrtcy. C.D.Ill.1992). In Stage Two of this litigation, both parties proceeded as though the transfers had been avoided solely under § 547 of the Bankruptcy Code as preferential transfers. In Stage One of the litigation, however, the parties had agreed if the transfers were avoidable that as to PEARSON the transfers were avoidable under § 549, and as to IME the transfers were avoidable under § 547, and this Court so held.
   Inasmuch as this Court is ruling in McCORD's favor on the argument it raises under § 550 of the Bankruptcy Code, 11 U.S.C. § 550, this Court need not consider the alternate arguments raised by the parties. Even if this Court would reach one of the alternative arguments made by McCORD that because the tires were not actually delivered to IME, the Court's prior ruling based on UCC § 2–326 was in error, and the TRUST-EE's assertion that because all tires were invoiced to PEARSON it is § 549 and not § 547 which applies, those arguments would not be considered in Stage Two because they should have been raised in Stage One and are now raised too late.

3. The stipulation alludes to Fremont Financial Corporation, the Bettendorf Bank and Gray Machinery Company. Hereinafter in this Opinion, except for the quoted portion of the stipulation, they shall be referred to as "FREMONT", "BANK" and "GRAY".

Inventory"). The Debtors continued to operate their businesses as Debtors-in-possession following their Chapter 11 filings and McCORD continued to supply tires and wheels to the Debtors-in-possession. After the Debtors' petitions were filed, McCORD continued to use the Galva warehouse as a drop shipment point for sale of its tires and wheels to customers in Illinois and Iowa.

7. Prior to and at the time of the bankruptcy petitions, Fremont Financial Corporation and Bettendorf Bank had blanket security interests in all of the Debtors' assets, including inventory. On November 14, 1989, the court entered an agreed preliminary cash collateral order permitting the Debtors to use cash collateral and granting Fremont Financial Corporation a post-petition lien in all of the assets and to the same extent as existed prior to the bankruptcy filings subject only to the prior liens of Bettendorf Bank. Paragraph 2 of the order provides that the liens and security interests of Fremont Financial Corporation shall constitute first, paramount and valid liens upon and security interests in the pre-petition collateral and are not and shall not be subject to any claims, setoffs or defenses by borrower or Debtors.

8. As of October 31, 1989, PEARSON was indebted to Fremont Financial Corporation in the amount of $1,125,995.46. (Per paragraph (D) of the court's findings in the agreed preliminary cash collateral order entered November 14, 1989.) As of November 1, 1989, IME was indebted to Fremont Financial Corporation in the amount of $597,665.87. (Per IME's schedules).

9. As of October 31, 1989, PEARSON was indebted to Bettendorf Bank in the amount of $2,384,906.33. As of November 1, 1989, IME was indebted to Bettendorf Bank in the amount of $2,384,905.53 (per IME's schedules). As collateral securing these debts, Bettendorf Bank had a perfected security interest in substantially all of the Debtors' assets, including inventory. (Per Motion for entry of order vacating the automatic stay and attached security agreements and financing statements filed by Bettendorf Bank on January 8, 1990).

10. On February 20, 1990, the bankruptcy court granted the motions of Fremont Financial Corporation and Bettendorf Bank to modify the automatic stay to allow them to exercise their rights against their collateral based on a finding that PEARSON and IME were unable to reorganize their affairs.

11. On April 9, 1990, PEARSON and IME filed a motion for authority to sell all of their respective assets pursuant to § 363(f) of the bankruptcy code. The motion proposed to sell as a going concern and free and clear of all liens, certain of PEARSON's and IME's personal and real property to Gray Machinery Company ("Gray") pursuant to the terms of an asset purchase agreement wherein Gray proposed to purchase certain of the assets of PEARSON and IME. The motion to sell property alleged that the Debtors' assets were fully encumbered by the Debtors' two primary secured lenders, Fremont Financial Corporation and Bettendorf Bank, and that the proposed sale would not harm the Debtors' unsecured creditors because the Debtors were unable to obtain a sales price for their assets exceeding the amount of liens against those assets.

12. The asset purchase agreement entered into on April 5, 1990 between Gray Machinery Company as buyer and PEARSON and IME as sellers, proposed that Gray would purchase certain of the Debtors' inventory, machinery and equipment, engineering data, customer lists, patents, trademarks and other intangible assets, and real estate for a total price of $950,000.00. $700,000.00 was to be paid to Bettendorf Bank and $250,000.00 to Fremont Financial Corporation.

13. On April 30, 1990, the court entered an order authorizing [the sale]....

15. All of the proceeds of the sale of the Debtors' assets to Gray were paid to Fremont Financial Corporation and Bettendorf Bank. If the Galva Inventory had been sold to Gray and Gray had paid additional consideration, all of the additional consideration would have been paid to these creditors and the Debtors' bankruptcy estates would have received none of the

additional consideration. The funds received by these creditors from Gray were substantially less than the amount owed each of these creditors by the Debtors.

25. After McCORD transferred possession of the Galva Inventory back to its Indiana warehouse, McCORD sold most of the Inventory items to retail purchasers in the Ordinary course of its business, except with respect to Inventory item numbers 5 and 11 on Exhibit A. These Inventory items are rims that were custom manufactured for PEARSON and were not usable by any other party. These items were remanufactured by McCORD. Accordingly, McCORD realized approximately $186,667 from the sale of the Galva Inventory to other customers, without deducting for the shipping costs, carrying costs and other costs associated with the Galva Inventory.

The issues involving damages can be categorized into two areas, issues relating to McCORD's liability under § 550 of the Bankruptcy Code, 11 U.S.C. § 550, as a transferee, and, if it is liable, how damages should be calculated, and issues relating to the determination of prejudgment interest. As to the former category of issues, there are three issues which are presented by McCORD in the alternative.

The transfer of the inventory to McCORD was avoided under § 547 as to IME and under § 549 as to PEARSON, and the first of these alternative issues is whether under § 550, which governs McCORD's liability as transferee of an avoided transfer and provides in part as follows:

[T]o the extent that a transfer is avoided under section ... 547 ... or 549 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property ...,

a recovery by the TRUSTEE would be "for the benefit of the estate." [4]

McCORD has disposed of the inventory, so it cannot be returned. Therefore, the TRUSTEE is entitled to a monetary recovery if the TRUSTEE can bring himself within the scope of § 550. It is McCORD's theory that § 550 governs the TRUSTEE's recovery, that the recovery must be "for the benefit of the estate", and that the estates would not benefit because FREMONT and the BANK had security interests in the inventory prior to and at the time of the bankruptcy petitions, and if the inventory had been sold to GRAY the additional consideration would have gone to FREMONT and the BANK who held security interests in the inventory and not to the estates for the benefit of unsecured creditors.

McCORD relies on *In re Baker,* 17 B.R. 392 (Bkrtcy.W.D.N.Y.1982). In that case the debtor, pre-petition transferred a yacht to his wife subject to an existing lien. The yacht was subsequently damaged. The bankruptcy trustee brought an action under § 548 and § 550 to recover the yacht. After first finding the transfer was fraudulent, the court then turned its attention to recovery under § 550, and finding for the trustee, stated:

The purpose and thrust of this section is to restore the debtor's financial condition to the state it would have been had the transfer not occurred. This purpose would not be accomplished by the return of the damaged yacht or its present value. The loss incurred by the debtor's estate as a result of the transfer was the market value of the yacht at the time of the transfer less the value of valid liens against the yacht at that time.

---

**4.** The language of § 550(a) which specifies that a trustee may recover "for the benefit of the estate," [the property transferred or its value], codifies the rule laid down in *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), that a recovery made by the trustee is for the benefit of all unsecured creditors in accordance with the distributive provisions of bankruptcy law and is not merely for the benefit of those who could have avoided the transfer outside of bankruptcy. 4 *Collier on Bankruptcy,* ¶ 550.02. p. 550-6—

550-7, n. 3 (15th ed. 1994). In interpreting and applying this provision, however, courts have gone beyond the holding in *Moore v. Bay,* and have ruled that a recovery may only be had under § 550 where the recovery will accrue for the benefit of the estate. *In re Acequia, Inc.,* 34 F.3d 800 (9th Cir.1994). As noted by the court in *Wellman v. Wellman, infra,* the issue has not often been litigated and the analysis of whether the recovery brings a benefit to the estate depends upon the particular facts of each case.

The TRUSTEE relies on *In re Enserv Co., Inc.*, 64 B.R. 519 (9th Cir. BAP 1986). In that case the debtor in possession in a chapter 11 case brought a preference action under § 547 with the understanding with a secured creditor that the secured creditor would finance the litigation and receive any recovery. In holding that the action could proceed the BAP stated:

> Whether a court may dismiss an adversary proceeding to recover a preference because a secured creditor would be the only beneficiary appears to be a question of first impression. Section 547 of the Bankruptcy Code ("Code") governs the recovery of preferences. The only exceptions to a preference are those listed in Section 547(c). No court has been empowered by Congress to create new exceptions to Section 547(b) by judicial decree. *In re Fulghum Const. Corp.*, 706 F.2d 171, 173 (6th Cir.1983).

> . . . .

> Section 547(b) plainly states that the only preferences which will be allowed are contained in Section 547(c). *See In re Fulghum Const. Corp., supra*, 706 F.2d at 172. To ascertain whether a transfer may be avoided "one need only read the statute and check each pigeon hole." *In re Howard*, 43 B.R. 135, 139 (Bkrtcy.Md.1983). Section 547(c) lists seven exceptions. Manpower does not argue that it is protected by any of them. Instead, Manpower attempts to create a new exception by focusing on who benefits from the recovery of a preference.

> Here both parties agree that it is unlikely that the class of general unsecured creditors, of which Manpower is one, will receive any distribution even if all preference actions are successfully pursued. Congress did not intend that actions pursued under Section 547 would be subject to question based on equitable considerations, such as who would reap the benefits. Such challenges could only unduly complicate bankruptcy administration, especially in the majority of cases where it is not clear who benefits from successful prosecution of preference actions until late in the administration of the case.

There is no statutory requirement that unsecured creditors or even the estate benefit from the voiding of a preference. Under Section 522(h) of the Code a debtor has standing to recover for his own benefit preferential payments that would otherwise constitute exempt property. The debtor may recover such property for his own benefit and not that of the bankruptcy estate. *Deel Rent–A–Car, Inc. v. Levine, supra*, 721 F.2d [750] at 754 n. 13 [ (11th Cir.1983) ]; *In re Smith*, 45 B.R. 100, 110 (Bkrtcy.E.Va.1984).

Congress wished only to facilitate a principle of equality of loss and prevent parties from benefiting from precipitous litigation. In the instant case the preference is being recovered for the benefit of the estate even though it is used to pay a secured creditor. There is nothing abusive in this. Section 547 mandates that each creditor must share equally with others of its class. By levying on its judgment, Manpower has been paid in full while the other unsecured creditors receive nothing. This is the situation that Section 547 was designed to prevent. *Deel Rent–A–Car, Inc. v. Levine, supra*, 721 F.2d at 754.

This Court's own research produced *Wellman v. Wellman*, 933 F.2d 215 (4th Cir.1991). In that case the debtor in possession in a chapter 11 case brought an action under § 548 and § 550 for damages and to set aside a pre-petition conveyance of stock he made to the defendants. In his chapter 11 plan the debtor in possession, in addition to payments, gave three creditors promissory notes secured by the action. The debtor in possession had the right to control the action with any recovery going to the secured creditors. On appeal from the district court ruling that the debtor in possession had no standing to maintain the action because it was not for the benefit of the estate, the court of appeals affirmed, stating:

> We, likewise, agree with the district court that §§ 548 and 550 provide for avoidances of transfers and allow recovery of the transferred property or its value only if the recovery is for the benefit of the estate.

> . . . .

We have not faced this § 548/550 standing issue before, nor has it received great attention from other appellate courts. Courts considering the issue, however, have, with unanimity, concluded that a trustee or a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by the recovery of the transferred property. In *Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582 (2d Cir.1950), the Second Circuit Court of Appeals refused to recognize the power of the Chapter 11 debtor to void a defective recorded lien under § 70(c) of the former Bankruptcy Act, 11 U.S.C. § 110(c), because voiding the lien would benefit only the debtor, not the unsecured creditors who had previously accepted the arrangement and could receive no more than the ten percent of their claims which had been provided. To this same general effect is *In re Vintero Corp.,* 735 F.2d 740, 742 (2d Cir.1984); *In re Schwab,* 613 F.2d 1279, 1281 n. 2 (5th Cir.1980); and *City Nat'l Bank & Trust Co. v. Oliver,* 230 F.2d 686, 690 (10th Cir.1956).

In our view, this conclusion in this case is mandated by the language of § 550(a) that "the trustee may recover, *for the benefit of the estate,* the property transferred." (Emphasis added.) In support of this principle, *Collier on Bankruptcy* states:

The preamble to section 550(a) limits the trustee by permitting recovery only for the benefit of the estate. Thus, in general, the trustee or debtor in possession may not recover the property transferred or its value when the result is to benefit only the debtor rather than the estate.

4 *Collier on Bankruptcy,* ¶ 550.02 n. 3 (15th ed. 1979).

John Wellman, nevertheless, insists that the estate would be benefitted if he were to succeed in regaining his stock or its value. Our final task in this context then is the review of the district court's determination that Wellman's § 548 action was not for the benefit of the estate. We agree with the bankruptcy courts that have generally recognized that the answer to that question depends on a case-by-case, fact-specific analysis. *See In re Tennessee Wheel & Rubber Co.,* 64 B.R. 721, 725 (Bankr.M.D.Tenn.1986) (noting that the " 'benefit' to unsecured claimholders necessary to support a debtor's post-confirmation recovery powers has taken many forms in the reported decisions"), *aff'd,* 75 B.R. 1 (1987); *In re Southern Indus. Banking Corp.,* 59 B.R. 638 (Bankr. E.D.Tenn.1986); *In re Join–In Int'l (USA), Ltd.,* 56 B.R. 555 (Bankr.S.D.N.Y. 1986); *City Nat'l Bank & Trust Co. v. Oliver,* 230 F.2d 686, 690 (10th Cir.1956). That analysis persuades us to the view expressed by the district court.

. . . .

The amended plan included nonrecourse notes to Citizens & Southern in the amount of $425,450, to Budd Leasing for $74,550, and to Travelers for $100,000. (Footnote omitted) Evidence, however, that these creditors would have accepted the plan without the nonrecourse notes are the conditions contained in the notes which precluded recovery on them in the event Wellman failed to prosecute the action or was unsuccessful in prosecuting it. More significant perhaps was the surplus remaining in the estate after payment of all creditors. John Wellman, with the court's approval, distributed to himself surplus cash and property valued at $2,524,769, several times the sum necessary to meet the short fall purportedly represented by the conditional notes.

The district court found that John Wellman executed the non-recourse promissory notes to the creditors in an attempt to create a claim in the estate so that he could obtain a "massive surplus recovery" for himself in addition to the surplus distributed to him. The court emphasized that the action of Wellman as debtor-in-possession could be maintained or dropped at his absolute discretion; the suit was not required by the secured creditors; and that under the settlement agreement, the secured creditors received cash and collateral sufficient to satisfy them. We agree.

While these cases reach the correct results based on their facts, their facts are different

from the facts in the case before this Court, and their reasoning may not be totally instructive for a determination of the issue before this Court. In this Court's view the starting point is to recognize the relationship between avoidance under §§ 547 to 549, recovery under § 550, and preservation under § 551 of the Bankruptcy Code, 11 U.S.C. § 551.

These relationships are discussed in *Bankruptcy, Epstein, Nickles & White,* Vol. 2, West, starting at Page 200. There the authors discuss the consequences of avoidance and in § 6–79 state:

The preceding umpteen pages mainly explain the trustee's avoiding powers, that is, the legal bases on which the trustee can avoid a transfer of property. A trustee is motivated to exercise those powers because of the three major consequences of avoidance: *nullification* of the transfer as against the trustee; *preservation* of the transfer for the benefit of the estate; and, in an appropriate case, *recovery* from transferees of the property or from other people who benefitted from the avoided transfer.

Nullification is the principal consequence of avoidance. It always occurs upon avoidance and predicates the other two consequences, but is also significant in its own right. Nullification essentially means that the transfer is retroactively ineffective and the transferee legally acquired nothing through it.

Preservation of the avoided transfer also occurs upon avoidance but is rarely practically important. In effect, it is an avoiding power which is used to defeat transfers that were subordinate to the avoided transfer under nonbankruptcy law.

Recovery goes beyond avoidance. Recovery is a bankruptcy remedy for avoidance which makes transferees of the affected property, and also people for whose benefit the transfer was made, personally accountable to the estate for the return of the property or for its value. Avoidance is always necessary for recovery, but recovery is not always necessary or even useful after avoidance. (Footnotes omitted)

Continuing in § 6–80 they go on to state:

In sum, our view of the relationship between avoidance and recovery is that avoidance, per se, legally annuls the transfer, and the transferred interest automatically becomes part of the estate. Recovery is a further step which makes transferees and beneficiaries of the transfer personally accountable to the estate with respect to the transferred property. Recovery does not define avoidance by providing the exclusive remedy for it; rather, recovery provides an additional remedy whenever avoidance alone provides incomplete relief. Recovery is necessary only when annulment of the transfer does not completely satisfy the estate. (Footnotes omitted)

Finally, in § 6–87 they state:

Congress deliberately distinguished between avoiding a transfer and recovering from the transferee. They are conceptually different, and each of them is remedially significant. Recovery depends upon avoidance but does not exclusively define it. Rather, recovery is a remedy that supplements the remedial effect of avoidance per se. Elsewhere we discuss the relationship between avoidance and recovery. Here we explain how recovery works.

Section 550 governs recovery. It provides in subsection (a) this basic remedial rule:

"[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) * * *, *the trustee may recover,* for the benefit of the estate, *the property transferred, or,* if the court so orders, *the value of such property* * * *."

Property or its value that is recovered pursuant to section 550(a) thereupon becomes property of the estate. The transferee has a claim for the amount she must disgorge which is treated as a pre-petition claim against the estate.

Notice that the trustee can recover the value of the transferred property only "if the court so orders." The clear implication is that recovering the property itself is the usual remedy and that recovering its value is extraordinary relief.

In practice, however, trustees recover damages about as often, maybe even more often, than they recover the transferred property itself. The main reason is that trustees commonly pursue defendants who are not in control of the property that was the subject of the avoided transfer. These defendants reconveyed, lost, expended or commingled the property (as, for example, if the property transferred was money) or never had it, and thus they are unable to return the property in species. The only appropriate remedy against such a defendant, and the remedy that is therefore routinely ordered, is recovery of the property's value. (Footnotes omitted)

In *Baker* the court does not give any reasons for the conclusion it reaches that the recovery should be reduced by the amount of valid liens against transferred property. In *Enserv Co.*, the court is correct that exceptions to preferences are found only in § 547(c), and under § 547(c) there is no exception based on who benefits from the recovery of a preference. But the court, in the early stages of that case was not asked to draw, nor does it draw, the distinction made in *Epstein* and *Wellman* between avoidance under § 547 and recovery under § 550. The court's statement that there is no statutory requirement under § 547 that unsecured creditors or even the estate benefit from the avoiding of a preference is correct, but cannot be used to defeat the clear requirements of § 550 for recovery. It should be further noted that *Enserv Co.* involved only an avoidance under § 547, while in the case before this Court the avoidance occurred under both § 547 and § 549. Therefore, the *Enserv Co.* court's analysis, to the extent it is applicable, is limited to the § 547 challenge and not the § 549 challenge in this case.

*Wellman* charts the correct course. It draws a distinction between avoidance and recovery, and requires any recovery to be for the benefit of the estate. Therefore, just as in *Wellman,* this Court addresses whether a recovery by the TRUSTEE would be for the "benefit of the estate." [5] Benefit to the es-

tate is not the same in a Chapter 7 case as in a Chapter 11 case. While benefit to the estate might be a somewhat unquantifiable concept in a Chapter 11 case, that is not true in a Chapter 7 case. In this Court's recent decision in *In re Patriot Illinois Corp.,* 181 B.R. 56 (Bkrtcy.C.D.Ill.1994), concerning the post-confirmation pursuit of a preference assigned to a creditor, it considered § 1123(b)(3)(B) of the Bankruptcy Code, 11 U.S.C. § 1123(b)(3)(B), which deals with plan provisions providing for the retention and enforcement of claims of the estate post-confirmation. Courts have interpreted that provision to require a benefit to the estate. *In re Churchfield Management & Inv. Corp.,* 122 B.R. 76 (Bkrtcy.N.D.Ill.1990). Benefit to the estate has been given a broad interpretation, and it may encompass past benefits to the estate which might have occurred prior to the actual recovery on a claim. *Churchfield Management, supra.* In *Patriot* this Court held that the estate benefited when a secured creditor withdrew its objection to the sale of the apartment complex, agreeing to permit the sale to go forward, in exchange for a payment of a specified sum receiving the right to pursue avoidance actions belonging to the debtor. Unsecured creditors who would not have otherwise received any payment were paid in full under the agreement with the purchaser. In *Enserv,* a Chapter 11 case, there was benefit to the estate, indirect in nature, in that the secured creditor advanced new funds to the debtor pursuant to a post-petition financing arrangement, in exchange for the secured creditor receiving the preference recovery.

■ In the administration of a Chapter 7 bankruptcy estate, the trustee has two major roles to play. As stated by Judge Ginsberg in his work:

A Chapter 7 trustee has two major roles. The first is to expeditiously liquidate the debtor's non-exempt assets, in a way that maximizes the return to the debtor's unsecured creditors. (Footnote omitted) The second major role is an investigatory one.

. . . .

5. As to this issue *Wellman* is factually distinguishable from the case before this Court. In *Wellman* the debtor was to benefit from the re-

covery. In this case McCORD argues secured creditors would benefit.

Beyond these few exceptions, the trustee takes the estate as it exists on the date of the petition. The trustee's major goal is to try to produce an estate for the debtor's unsecured creditors, and the trustee will try to do so in several ways. The first and most obvious is to liquidate the debtor's nonexempt property that is not subject to liens. (Footnote omitted) The second is to pursue causes of action belonging to the debtor. (Footnote omitted) The third is to pursue the trustee's own causes of action to recover money or property under the trustee's avoiding powers. (Footnote omitted)

Vol. 1 Robert E. Ginsberg, *Bankruptcy; Text, Statutes, Rules,* Third Ed. § 12.06(a). A Chapter 7 trustee in bankruptcy represents the interest of the unsecured creditors and not the secured creditors. *In re Chicago Lutheran Hosp. Ass'n,* 89 B.R. 719 (Bkrtcy. N.D.Ill.1988), citing *Matter of Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982). As the court in *In re Thu Viet Dinh,* 80 B.R. 819 (Bkrtcy.S.D.Miss.1987), outlined:

> In addition to the statutory duties enumerated [in 11 U.S.C. § 704], the [Chapter 7 trustee] is considered to be a fiduciary of the secured creditors with the duty to exercise reasonable care as custodian of the properties which serve as collateral for the secured claims.
>
> . . . .
>
> [I]t is a fundamental concept in bankruptcy that a trustee's primary duty is to the unsecured creditors rather than to the secured creditors. The secured creditors, for the most part, should be able to look to their collateral for satisfaction of their claims. If there is no equity in the collateral for the bankruptcy estate or if the property is burdensome to the estate, the trustee generally abandons the property pursuant to 11 U.S.C. § 554(a), an uncomplicated ministerial act that occurs on numerous occasions in literally thousands of cases.

The court went on to state that where property is fully encumbered, abandonment is the order of the day. A Chapter 7 Trustee should not act as a mere conduit for the benefit of secured creditors only. *See In re H.E. Graf, Inc.,* 125 B.R. 604 (Bkrtcy. E.D.Cal.1991).

Therefore, the issue becomes, who would benefit from the TRUSTEE's recovery, unsecured creditors or FREMONT and the BANK? The TRUSTEE argues that a secured creditor cannot recover the proceeds of a preference which the trustee has avoided, and a number of courts have so concluded. Judge Lessen, fellow Bankruptcy Judge for the Central District of Illinois, recently decided the issue in *In re Bill Perhay Chevrolet, Inc.,* 172 B.R. 28 (Bkrtcy.C.D.Ill.1994). There, the debtor recovered a preferential transfer, and a secured creditor who held a perfected security interest in all of the debtor's "accounts" and "contract rights" claimed the recovered funds. Judge Lessen ruled:

> Mindful of the split in authority on this issue, this Court embraces the analysis and the outcome of *In re Tek–Aids Industries, Inc.,* 145 B.R. 253 (Bankr.N.D.Ill.1992), wherein Judge Ginsberg, in addressing this very issue, stated as follows:
>
> > The estate's causes of action for the preferences did *not* exist before the filing of the Chapter 11 petition. If the Debtor had never filed bankruptcy, none of the preference actions could ever have been brought by anybody (emphasis in original).
> >
> > . . . .
> >
> > (T)o rule otherwise would give *every* secured creditor with a properly perfected security interest in all of the Debtor's personal property a lien on recoveries by the Trustee in preference actions. This would not only defy logic, but would undermine the policy behind the avoidance powers as well (citation omitted). The estate's right to sue under § 547 is a special power Congress grants to the fiduciary in charge of the estate to implement the policy underlying the Code of fair and equal treatment of creditors (citation omitted). Allowing a prepetition blanket security interest to reach preference actions would be tantamount to giving a creditor additional collateral it would not have had if the debtor had not filed a bankruptcy petition or had a petition filed against it. Such a windfall

contradicts any notion of fair and equal treatment among creditors (footnote omitted) (emphasis in original).

*Accord In re Van De Kamp's Dutch Bakeries,* 908 F.2d 517 (9th Cir.1990) (avoided fraudulent transfers preserved for the benefit of the estate). *Contra In re Figearo,* 79 B.R. 914 (Bankr.D.Nev.1987) (funds recovered in fraudulent conveyance action were subject to creditor's security interest.)

In *In re Sun Island Foods,* 125 B.R. 615 (Bkrtcy.D.Hawaii (1991), the court reconciles the two positions. After noting the application of § 9–306(4) of the U.C.C. which limits the secured creditor's interest in "proceeds" in the event of insolvency proceedings, the court stated:

It is well settled that a Trustee's right to pursue a preference action does not become collateral to any party's security interest. (Citation omitted) The reason is that a trustee's right to recover preferences cannot be assigned to another entity. (Citation omitted) As such, the right to pursue a preference action cannot be collateral for a security interest. Clearly a creditor cannot compel a trustee to pursue a preference action, unless the trustee has unjustifiably failed to commence an avoidance action. (Citation omitted)

In contrast, however, are the recoveries themselves from a preference action. There appears to be split of authority in this matter. One view is that the recoveries themselves can be subject to a secured creditors security interest. *See e.g. In re Figearo,* 79 B.R. 914 (Bankr.Nev.1987). Other courts have held recoveries cannot be subject to a security interest. (Citation omitted)

After noting that the preference actions arose only as a result of the filing of the bankruptcy, and that absent such there would have been no recovery, the court continued:

Indeed, it is illogical to allow a secured creditor to attach the proceeds of recoveries, while at the same time preventing it from compelling a trustee to pursue a preference action. If the trustee herein had not pursued the preference actions, the secured creditor could not have sued on its own to recover the preferences. Yet, by the Trustee having pursued the recoveries, the Plaintiff argues that the secured creditor now is in a position to claim the proceeds as covered by their security interest. This is an anomaly, and it results in the use of powers created by the Bankruptcy Code for the benefit of one creditor alone, and is to be avoided. (Citation omitted)

Plaintiffs cite *In re Figearo,* 79 B.R. 914 (Bankr.Nevada 1987) in support of their motions herein. However, in that case, the transfer was fraudulent, and therefore the secured creditor had an independent right to recover the merchandise transferred to the third party. *See also In re Mid–Atlantic Piping Products of Charlotte,* 24 B.R. 314 (Bankr.N.D.1982) (inventory transferred to third party in satisfaction of debt still subject to secured party's security interest); *In re Lively,* 74 B.R. 238 (D.C.Ga.1987) (trustee's recovery on a fraudulent claims conveyance action subject to prepetition judgment lien creditors.)

In all of the cases noted above, the secured parties had a right independent of the bankruptcy action to recover the monies and/or property transferred. Plaintiffs allege, without any support, that they too have a right to pursue the third party vendors to recover payments made to them prior to the filing of this petition, stating "it is obvious that under Hawaii State law, Liberty Bank could have brought a cause of action against the various third parties who were paid because the payment of the proceeds from the inventory to third parties occurred while the [Debtor] was insolvent."

In this case, the payments to vendors were from sale of inventory and equipment. At most, however, Liberty Bank's blanket lien in the proceeds continued only if the disposition was unauthorized. As noted earlier, the official comments to Uniform Commercial Code Section 9–306 states that, where cash proceeds covered by a security interest are placed into the Debtor's checking account and then paid out in the operation of the Debtor's business, recipients of the funds takes clear of

any claim which the secured party may have in them as proceeds, assuming that these payments were in the ordinary course of the business.

Although it is clear that a security interest in property may continue notwithstanding sale, exchange, or other disposition of property, the proceeds must be identifiable. It may be that, when the Debtor paid the monies to the vendors they were identifiable; however, these funds ceased to be identifiable once the vendors deposited the funds in their own accounts.

The case of *In re Figearo,* 79 B.R. 914 (Bkrtcy.D.Nev.1987), cited in *Sun Island Foods,* though not decided on the same procedural basis, is factually on point. The trustee compromised a fraudulent conveyance action involving a prepetition transfer of the debtor's inventory to a pawnbroker, and the secured creditor sought turnover of the funds in the hands of the trustee. The court first noted that the majority of cases hold that the property recovered by the estate through the trustee's avoiding powers remains subject to a prepetition perfected security interest. The court relied on *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), cited by the TRUSTEE in this case, in coming to the conclusion that the funds are subject to prepetition security interest:

The facts before this court present two issues under § 552 that the court must consider. The first issue is whether the right to avoid transfers under the trustee's various avoiding powers constitutes proceeds, product, offspring, rents, or profits of the inventory as provided in the security agreement and applicable nonbankruptcy law. If so, the security interest would extend to any recovery by the trustee under § 552(b). The second issue, which involves the interpretation of 11 U.S.C. § 552(a), is whether any property recovered by the trustee under his avoiding powers remains subject to any security interest that was enforceable against the transferee of the avoided transfer.

The holding in *[In re] Integrated Testing [Products Corp.],* [69 B.R. 901 (D.N.J. 1987)], addressed, and clearly resolved the first issue against the secured creditor.

Proceeds are defined in the Uniform Commercial Code as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." [§ 9–306(a)]. "Money, checks, deposit accounts and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.' " *Id.* The trustee's right to set aside the transfers, arguably contingent noncash proceeds, is created on the filing of the bankruptcy petition. Further, the trustee is generally the only party in interest with standing to pursue these rights. *See* 69 B.R. at 904. Although the trustee's rights are dependent on the nature of the transfer, they are not received upon the sale, exchange, collection or other disposition of collateral or other disposition of collateral or proceeds. Therefore, the trustee's right to set aside a fraudulent transfer can not be considered proceeds under § 9–306(a).] As a result, § 552(b) does not extend [the creditor's] security interest to the right to set aside and recover property based on the trustee's avoiding powers.

Having determined that [the creditor] has no security interest in the trustee's right to set aside a fraudulent conveyance, the court turns to the issue of whether [the creditor's] security interest attaches to the property recovered by the trustee.

The parties agree that [the creditor's] security interest was properly perfected and attached to the inventory transferred to [the pawnbroker.] In addition, the court finds [the creditor's] security interest continued in the inventory items after the transfer to [the pawnbroker] pursuant to [§ 9–306(2) and § 9–307 of the U.C.C. or as an ineffective bulk transfer.]

In addition to holding the property subject to [the creditor's] security interest, [the pawnbroker's] liability to the trustee as the transferee of an avoided transfer is set forth in 11 U.S.C. § 550 which provides in relevant part as follows:

(a) [t]o the extent that a transfer is avoided . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

764

(1) the initial transferee ...

The introductory language of § 550(a) indicating that the trustee's recovery is for the benefit of the estate is derived from *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931). *See Collier,* § 550.02 n. 3 (15th Ed.1979). In *Moore,* the bankrupt executed and failed to perfect a chattel mortgage. Credit had been extended to the bankrupt before and after the chattel mortgage was finally perfected. The mortgage was ultimately avoided by the trustee. The issue before the Court was whether the chattel mortgage should be deemed void against all creditors or only those extending credit prior to perfection. Reversing the Court of Appeals, the Supreme Court held that the lien was void as to all creditors. 284 U.S. at 5, 52 S.Ct. at 3. In other words, "recovery by the bankruptcy trustee of property conveyed in fraud of one class of creditors nevertheless inures to the benefit of all classes of general creditors...." *Collier,* § 548.03.

The law established in *Moore* is well settled, and has been clearly incorporated into the Bankruptcy Code. Without question, any property recovered by the trustee as a result of an avoided transfer must be distributed to creditors in their order of priority to the extent the estate has equity in the property recovered. At issue, is whether the collateral, subject to [the creditor's] properly perfected security interest in the hands of [the pawnbroker], was extinguished by the trustee's recovery of the property, or its value under 11 U.S.C. § 550. The resolution of this issue requires interpretation of 11 U.S.C. § 552(a) which provides in relevant part as follows:

(a) [P]roperty acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

As previously stated, the purpose of 11 U.S.C. § 552(a) is to avoid the postpetition application of an otherwise valid after-acquired property clause in a security agreement. The statute allows the estate to acquire new property with estate assets free of the security interest. Applying § 552(a) to avoid a security interest in property recovered through the trustee's avoiding powers appears to go beyond what the statute was designed to accomplish. In any event, the crucial question is whether the avoidance of a fraudulent transfer under 11 U.S.C. § 548 and recovery of the property under 11 U.S.C. § 550 constitutes an acquisition of property by the estate within the meaning of 11 U.S.C. § 552(a).

This court holds that such an avoidance and recovery of property by the trustee is not equivalent to a postpetition acquisition of property by the estate as contemplated by 11 U.S.C. §§ 552(a) or 541(a)(7).

It is this court's opinion that the estate's interest in the transferred property was acquired upon commencement of the case. 11 U.S.C. § 541(a)(3). The transferee merely held voidable title to the transferred property. *See* 11 U.S.C. § 548(c). The successful exercise of the trustee's avoiding power causes the affected transfer to become void, allowing the trustee to recover the property under 11 U.S.C. § 550. Any property recovered by the trustee was subject to [the creditor's] security interest at the time the debtor transferred the property to [the pawnbroker] and continued in the property after the transfer.

■■■ In summary, where a secured creditor has an independent claim against a third party to recover property transferred by a debtor to the third party, that claim cannot be cut off by a trustee's exercise of the Code's avoiding powers to recover the property and will have priority over a trustee's claim to the property arising out of the exercise of the avoiding powers. However, where the secured creditor has no independent claim to the property which is subject to the trustee's avoiding powers and could not recover it from the third party, the secured creditor cannot improve its position because of the trustee's exercise of the avoiding powers and assert an additional claim by claiming it from the trustee who recovered it from the third party by exercising the avoiding powers.

In the case before this Court, it is stipulated FREMONT and the BANK held liens on all the Debtors' assets, including the inventory. Their liens would include proceeds under the Uniform Commercial Code. Assuming the inventory had been sold by the Debtors and the proceeds used to make a preferential payment to a third party and the proceeds were not traceable by FREMONT or the BANK, they would have no independent action against the third party to recover the proceeds of their collateral, and they could improve their position by relying on the TRUSTEE's avoiding powers and claim the proceeds of a preference recovery.

However, those are not the facts of this case. In this case, it is stipulated FREMONT and the BANK held liens on the inventory. It follows that they could, by an independent action against McCORD, recover the inventory or its value. They would not have to rely on the TRUSTEE avoiding the transfer to McCORD to have a claim. Nor does the TRUSTEE's avoiding of the transfer to McCORD eliminate their lien status. If the TRUSTEE were successful in recovering the value of the inventory, FREMONT and the BANK could in turn obtain the recovery from the TRUSTEE. As FREMONT and the BANK had valid prior liens on the inventory, any recovery would accrue to their benefit and not the benefit of unsecured creditors. Therefore, there would be no benefit to the estate which would accrue to unsecured creditors.

On this point the TRUSTEE argues that he has settled with FREMONT and the BANK and the recovery is for the benefit of unsecured creditors. Unfortunately that fact is not in the stipulation. To the contrary, the stipulation is clear that FREMONT and the BANK had security interests in the inventory prior to and at the time of the bankruptcy filings, and if it had been sold they would have been entitled to the proceeds. In *In re Robert T. Noel Coal, Inc.,* 97 B.R. 254 (Bkrtcy.W.D.Pa.1989), the court denied a motion by one of the parties to withdraw a fact that had been stipulated to one year prior to trial, stating:

> Stipulations serve as surrogates for findings of fact made in the course of trial proceedings and are generally binding on the tribunal as well as the parties. *Fisher v. First Stamford Bank and Trust Co.,* 751 F.2d 519 (2d Cir.1984); *Lyles v. American Hoist & Derrick Company,* 614 F.2d 691 (10th Cir.1980); *W.D. Rubright Company v. International Harvester Company,* 358 F.Supp. 1388 (W.D.Pa.1973). Stipulations may not ordinarily be withdrawn by one party without the consent of the other. This is especially true where, as here, the non-consenting party would be prejudiced thereby. (Citations omitted)

> In the absence of fraud, accident or mistake, we cannot set aside a stipulation signed by counsel as representatives of the parties. Mere inadvertence or inattention to the language employed in a stipulation is simply insufficient grounds. (Citations omitted) This Court conducts a great deal of business each day in reliance upon written stipulations by and between parties and counsel. To disrupt a trial we must find circumstances far more extraordinary than those offered on the record.

It would, however, be proper to take judicial notice of the TRUSTEE's settlement with FREMONT. Rule 201 of the Federal Rules of Evidence provides:

#### JUDICIAL NOTICE OF ADJUDICATIVE FACTS

(a) *Scope of Rule.* This rule governs only judicial notice of adjudicative facts.

(b) *Kinds of Facts.* A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) *When Discretionary.* A court may take judicial notice, whether requested or not.

(d) *When Mandatory.* A court shall take judicial notice if requested by a party and supplied with the necessary information.

(e) *Opportunity to Be Heard.* A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) *Time of Taking Notice.* Judicial notice may be taken at any stage of the proceeding.

(g) *Instructing Jury.* In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

Russell, *Bankruptcy Evidence Manual,* 1994–95 Ed. § 201.5, addressing judicial notice of Bankruptcy Court's own records, provides:

It is generally accepted that a Bankruptcy Judge may take judicial notice of the Bankruptcy Court's records. "It is not error, ... for a court to take judicial notice of related proceedings and records in cases before that court." *State of Fla., Etc. v. Charley Toppino & Sons, Inc.,* 514 F.2d 700, 704 (5th Cir.1975).

But even if this Court were to take judicial notice of the Court's own file, it is not clear that the settlement is as represented by the TRUSTEE. The "Application to Settle and Compromise Claim" circulated by the TRUSTEE provided:

The parties have reached a settlement, pursuant to which Fremont Financial Corporation ("Fremont") will pay the Trustee $95,000 in full settlement of all claims which the Trustee has against Fremont. In addition, Fremont will withdraw all claims it has in the Pearson and IME bankruptcies, including any claims arising out of the following litigation:

[*Barber v. Riverside International Trucks, Inc.,* 142 B.R. 831 (Bkrtcy. C.D.Ill.1992) ]

This settlement is evidenced by two letters dated July 6 and 7, 1993, from Fremont's attorney, William C. Meyers, to Barry M. Barash (attached). [As exhibits to the Application.]

The letter from Meyers to Barash, dated July 7, 1993, provides:

In response to your telephone message to me this morning, Fremont agrees that in addition to the payment of $95,000, contemporaneously with the execution of the settlement documentation, Fremont will withdraw all currently filed claims, and make no future claims, to any proceeds the Trustee recovers in the Riverside action.

The order approving the settlement and compromise, entered by this Court on August 24, 1993, is broader than the notice:

*TERMS OF COMPROMISE*

Fremont will pay the Trustee $95,000 in full settlement of all claims which the Trustee has against it. In addition, Fremont will withdraw all claims it has in the Pearson and IME bankruptcies, including any claims arising out of the following litigation:

[Riverside]

This settlement is [evidenced by the two letters.]

\* \* \* \* \* \*

*FREMONT'S WITHDRAWAL OF CLAIMS*

Upon entry of this order, Fremont will withdraw its currently-filed claims in the Pearson and IME bankruptcies and will make no future claims to the proceeds of the Trustee's recovery in the Riverside litigation or to any other recoveries which the Trustee has heretofore made against others or which the Trustee may in the future recover against others.

The settlement documents are not a part of the file. Based on this limited record there is only a reference to a release of the Riverside litigation and none as to the McCORD litigation.

The TRUSTEE makes two other arguments which also need to be addressed. The first is that the avoided transfer is preserved for the benefit of the estate under § 551 of the Bankruptcy Code. 11 U.S.C. § 551. While that statement in and of itself is correct, it has no consequence in the case before this Court. As pointed out in *Epstein* the

impact of § 551 is to defeat transfers subordinate to the avoided transfer under non bankruptcy law. For example, if the TRUSTEE had defeated the prior lien of the BANK, the BANK's lien could be preserved for the benefit of the estate to defeat the lien of FREMONT. There is nothing in the record to indicate that McCORD held a lien which was prior to FREMONT's or the BANK's, and that lien was defeated during Stage One. In fact, the holding in Stage One was to the effect that McCORD held no lien.

The second argument is that since § 541 of the Bankruptcy Code, 11 U.S.C. § 541, defines "property of the estate" in broad terms, and any diminution of the bankruptcy estate is a "transfer" of property of the estate and preferential. This argument misses the point as a "transfer" is a requirement under § 547. That hurdle has been crossed by the TRUSTEE during Stage One. It is not a requirement under § 550. Furthermore, the phrases "property of the estate" and "for the benefit of the estate" can have different consequences. For example, if a debtor owns property subject to a creditor's lien which amount exceeds the value of the property, the property is "property of the estate," but there is no "benefit to the estate" as the lien exceeds the property's value. That is the fact in this case.

For these reasons, this Court finds that any recovery that the TRUSTEE would receive from McCORD would not be for the "benefit of the estate," and therefore, the TRUSTEE is not entitled to recover under § 550 of the Bankruptcy Code. As this issue is controlling, there is no need for this Court to rule on the other issues raised at Stage Two of this litigation.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.